Shihche E. LIN, Individually and d/b/a Aptus Company, and Sung–Ping H. Lin, Appellants,

v.

METRO ALLIED INSURANCE AGENCY, INC. and C. Michael McGlothlin, Appellees.

No. 01–05–00196–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Aug. 31, 2007.

Richard N. Countiss, Williams Kherkher, Houston, for appellants.

Daniel W. Burrows, Nicholas J. Lanza, for appellees.

Panel consists of Justices TAFT, ALCALA, and HANKS.

## MEMORANDUM OPINION

GEORGE C. HANKS, JR., Justice.

A jury found that Metro Allied Insurance Agency, Inc. and C. Michael McGlothlin (collectively "Metro") negligently and in violation of the Texas Decep-

tive Trade Practices Act ("DTPA"), caused damages to Shihche E. Lin, individually and d/b/a Aptus Company, and Sung–Ping H. Lin (collectively "Lin"). Metro moved for and was granted a Judgment Notwithstanding the Verdict ("JNOV") ordering that Lin take nothing. Lin complains that the trial court erred in granting the JNOV because there was sufficient evidence: (1) to show that Metro knowingly engaged in an unconscionable course of action that was a producing cause of damages to Lin under the DTPA, (2) to show that Metro's negligence proximately caused damages to Lin, and (3) to justify the trial court's submission of the issues to the jury. Metro raises three cross-points arguing that, if we hold that there was some evidence of liability and damages under both the negligence and DTPA causes of action, we should also hold that the evidence is factually insufficient. We reverse and remand.

## Background

In November 1998, Lin was awarded a $1,265,110 contract with the U.S. Government to upgrade the technology in a hydroelectric plant located in Sault Sainte Marie, Michigan. The terms of the contract required Lin to purchase and maintain both a Performance Bond, to ensure the timely performance of the contract, and a Commercial General Liability Insurance ("CGL") policy.[1] Accordingly, Lin purchased a Performance Bond from Chatham Reinsurance Company and began searching for a CGL policy. The search took almost one year, and Lin testified that, in his search for a CGL policy, he was looking for a comprehensive plan that would protect him in the event that there was a problem with his performance under the

---

1. "Grossly oversimplified, general liability insurance may generally be said to cover an insured's liability for damages accidentally caused to third parties that are not covered under other, more specific types of liability insurance policies—business, automobile, and employer's liability, for example." *Bituminous Cas. Corp. v. Maxey*, 110 S.W.3d 203, 207 (Tex.App.-Houston [1st Dist.] 2003, pet. denied).

government contract. He received quotes from two agencies: Elbert Insurance and Metro. On the Elbert quote, the line providing for "contractual coverage" was checked. This was an indication, according to Lin, that the Elbert policy would have protected against claims resulting from any breach of contract. Lin faxed Metro a copy of the Elbert quote as an example of the coverage that he was seeking. McGlothlin, Metro's agent, testified that the Elbert quote was in Lin's file, but there was no testimony reflecting that the quote he provided Lin was based on the Elbert quote. Lin accepted a policy offer from Metro and paid the requisite premium in January 2000.

Six months later, in June of 2000, Lin's government contract was terminated, and the surety company fulfilled the remainder of his contractual obligations in accordance with the terms of the Performance Bond. After the contract was terminated, Lin canceled his CGL policy with Metro and was refunded a pro-rated portion of the premium. The surety company later brought suit against Lin, seeking $200,000 in indemnity under the Performance Bond for the expenses it incurred while completing Lin's government contract.[2]

After representing himself for more than one year in the surety's suit, Lin asked Metro to defend him under the terms of his CGL policy. Lin testified that McGlothlin indicated that an insurance defense lawyer would be available to represent him. According to Lin, on multiple occasions, McGlothlin promised that he was covered under the CGL policy. Lin further testified that what followed these promises, however, was months of waiting for an attorney to represent him. Lin notified McGlothlin that the surety had filed a motion for summary judgment in its suit against him, and the next month Lin received a letter from McGlothlin's errors and omissions attorney indicating that Lin's claim was denied. The summary judgment was granted, and, several months later, Lin paid the surety company $175,000 in settlement. Lin was eventually informed by McGlothlin that no policy had actually been written for him.

McGlothlin, on the other hand, testified that he never made any promises to Lin regarding coverage under the CGL policy, and, that it would be unusual for a CGL policy to have included the type of coverage Lin was seeking. He emphasized in his testimony that the only representations he made to Lin were that he had a policy. It was not until Lin made a claim under the policy that McGlothlin realized that he could not locate Lin's file. According to McGlothlin, he spent a substantial amount of time looking for Lin's file, and he came to the conclusion that the file had been removed from his desk prior to the policy being written and was taken to an off-site storage facility without his knowledge. After discovering that no policy existed, McGlothlin notified his errors and omissions carrier and later informed Lin of the problem.[3] Lin sued Metro, alleging that Metro was negligent and violated the DTPA by failing to obtain an insurance policy that would have covered his contractual liability to the surety company. The jury returned a verdict in Lin's favor and

---

2. The surety brought suit against Lin reciting that, pursuant to the indemnity provision of the Performance Bond, Lin was contractually obligated under the Bond to reimburse the surety for any expenditure it made pursuant to the Bond.

3. Lin had made premium payments, and, when Lin cancelled the policy on June 26, 2000 after the government contract was terminated, he was issued a pro rata refund. Once it was discovered that Metro had not issued a policy, Lin was refunded the remainder of the premiums paid.

awarded him $175,000 as compensation for his negligence claim, $200,000 as compensation for his DTPA claim, and $300,000 in additional DTPA damages. Metro moved for a JNOV and argued that Lin had presented no evidence of either causation or damages in any of his claims. The trial court granted Metro's JNOV, and Lin filed this appeal.

## JNOV

In four issues, Lin complains that the trial court improperly granted Metro's motion for JNOV because there was sufficient evidence to sustain the jury's findings that (1) Metro knowingly engaged in an unconscionable course of action that was the producing cause of harm to Lin and (2) Metro's negligence proximately caused Lin harm. Lin also asserts that there was sufficient evidence to justify the trial court's submission of the issues to the jury.

### A. Standard of Review

An appellate court reviews a JNOV under a no-evidence standard of review. *Williams v. Briscoe,* 137 S.W.3d 120, 124 (Tex.App.-Houston [1st Dist.] 2004, no pet.). Under this standard of review, we will affirm the JNOV only if the record reveals one of the following: (1) the complete absence of a vital fact, (2) the court is barred by the rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence conclusively established the opposite of the vital fact. *City of Keller v. Wilson,* 168 S.W.3d 802, 810 (Tex.2005). More than a scintilla of evidence exists if the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex.2003). If the evidence does no more than create a mere surmise or suspicion of fact, less than a scintilla of evidence exists. *Id.*

In our review, we consider only the evidence and reasonable inferences that tend to support the jury's findings. *Best v. Ryan Auto Group, Inc.,* 786 S.W.2d 670, 671 (Tex.1990) (per curiam); *Williams,* 137 S.W.3d at 124. That is, we view the evidence in the light most favorable to the verdict. *Williams,* 137 S.W.3d at 124.

### B. DTPA

In issue one, Lin argues that the trial court erred in granting the JNOV because there was sufficient evidence to support the findings that McGlothlin engaged in an unconscionable course of action that was the producing cause of $200,000 in damages to Lin. In issue two, Lin contends that the trial court erred in granting the JNOV because the evidence was sufficient to support the findings that McGlothlin knowingly engaged in an unconscionable course of action that was the producing cause of $300,000 in damages to Lin. We agree.

The jury was asked:

#### QUESTION 3

Did Mike McGlothlin/Metro Allied Insurance engage in e engage in any unconscionable action or course of action that was a producing cause of damages to the Plaintiffs?

"Producing cause" means an efficient, exciting, or contributing cause that, in a natural sequence, produced the damages, if any. There may be more than one producing cause.

An unconscionable action or course of action is an act or practice that, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree.

Answer "Yes" or "No"

Answer: (Yes)

The jury found that Lin should be compensated $200,000 because of such conduct. Because it answered Question 3 "yes," the jury was asked:

### QUESTION 5

Did Mike McGlothlin and/or Metro Allied Insurance d Insurance engage in any such conduct knowingly?

"Knowingly" means actual awareness, at the time of the conduct, of the falsity, deception, or unfairness of the conduct in question. Actual awareness maybe [sic] inferred where objective manifestations indicate that a person acted with actual awareness.

In answering this question, consider only the conduct that you have found was a producing cause of damages to Shihche E. Lin, Individually and d/b/a Aptus and Sung–Ping Lin.

Answer "Yes" or "No"

Answer: (Yes)

The jury awarded an additional $300,000 to Lin because Metro's conduct was committed knowingly.[4]

As submitted, Lin's DTPA cause of action required a showing that McGlothlin (1) engaged in an unconscionable act or course of action (2) that was a producing cause of damages. If the jury believed that McGlothlin did engage in such an activity, then Lin must show (3) that the act or course of action was committed knowingly and (4) caused damage to him.

### 1. Engaged in Unconscionable Act or Course of Action

It is undisputed that Metro did not issue a CGL policy for Lin, despite representing to him that a policy had been issued and despite Metro's acceptance of Lin's premium payment. Lin testified that McGlothlin repeatedly assured him that Metro's policy would cover him in his defense against the surety's claim. Lin even testified that, on one occasion, McGlothlin told him that Lin's missing file had been found, and the file reflected that Lin was insured by Burlington Insurance. Over the course of one year, Lin continued to pursue his right to legal representation under his Metro policy, and, in response, Lin was assured that his lawyer would be furnished "Tuesday," "next week," "week after next," "in ten days," and "in 60 days." Lin testified that, in May, McGlothlin told him that he "had coverage" and that McGlothlin was "working with the insured's lawyer to defend my case." Seven months later, Lin learned that there was no policy, no coverage, and no legal representation for him in the surety's case. Because Lin was repeatedly assured that he was covered under the Metro policy, he did not seek representation elsewhere, he did not attempt to negotiate with the surety company, and he went to trial unrepresented, ultimately resulting in a $175,000 settlement.

The jury was instructed that "an unconscionable action or course of action is an act or practice that, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." We conclude that there is more than a scintilla of evidence that, to Lin's detriment, McGlothlin's course of action took advantage of Lin's lack of knowledge to a grossly unfair degree.

### 2. Action was Producing Cause of Damages

We must next determine if there was more than a scintilla of evidence to show

**4.** Lin did not object to the charge, but the trial court overruled Metro's no-evidence objection to the charge. Metro did not object to the form of the charge.

that McGlothlin/Metro's action or course of action was the producing cause of Lin's damages. The jury was instructed that " '[p]roducing cause' means an efficient, exciting, or contributing cause that, in a natural sequence, produced the damages, if any. There may be more than one producing cause." The evidence, when reviewed in the light most favorable to Lin, establishes that, had McGlothlin not represented to Lin that he was covered under the policy, Lin would have had an opportunity to obtain coverage elsewhere, such as from Elbert Insurance, which gave him the original coverage quote. Had he been covered elsewhere, Lin would not have been personally responsible for the settlement of the surety's claim. We conclude that there is more than a scintilla of evidence to support the jury's affirmative finding to jury Question 3—"Did Mike McGlothlin/Metro Allied Insurance engage in any unconscionable action or course of action that was a producing cause of damages to the Plaintiffs?" Accordingly, we sustain issue one.

### 3. Action was Knowingly Committed

Under the additional DTPA damages claim, the jury was asked if McGlothlin/Metro engaged in the conduct knowingly. The jury was instructed that " '[k]nowingly' means actual awareness, at the time of the conduct, of the falsity, deception, or unfairness of the conduct in question. Actual awareness maybe [sic] inferred where objective manifestations indicate that a person acted with actual awareness."

Lin testified that McGlothlin knew "early on" that no policy had been issued, but he continued to mislead Lin to Lin's detriment. McGlothlin even told Lin that he had been in contact with the lawyer who would be representing Lin in the surety suit when, in fact, there was no such lawyer. Lin testified that McGlothlin repeatedly told him not to communicate with

the surety's lawyers until his lawyer became available. We conclude that there is more than a scintilla of evidence that McGlothlin/Metro knowingly engaged in the action or course of action.

### 4. Action Caused Damage

The jury was asked to determine if McGlothlin/Metro's knowing conduct was a producing cause of damages to Lin. As previously stated, had Lin been insured, he would not have been personally liable for the surety's claim. Furthermore, Lin testified that he was in the process of entering into settlement negotiations with the surety when McGlothlin told him not to contact the surety's lawyers until his lawyer became available. Three months later, the surety filed a motion for summary judgment, which was ultimately granted. We conclude that there is more than a scintilla of evidence to support the jury's affirmative finding to jury Question 5. Accordingly, we sustain issue two.

## C. Negligence

■ In issue three, Lin argues that the trial court erred in granting the JNOV because there was sufficient evidence to sustain the jury's finding that Metro's negligence proximately caused him damages in the amount of $175,000. We agree.

Here, the jury was asked:

*QUESTION 1*

Did the negligence, if any, of Michael McGlothlin/Metro Allied Insurance Agency, Inc., proximately cause the injury in question?

Answer "Yes" or "No": (YES)

"Negligence," when used with respect to the conduct of any person, means failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that

which a person of ordinary prudence would not have done under the same or similar circumstances.

"Ordinary care," when used with respect to the conduct of any person, means that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances.

"Proximate cause" means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

The jury's finding was unanimous, but the trial court granted Metro's motion for JNOV. If there is more than a scintilla of evidence that "the negligence, if any, of [Metro], proximately cause[d] the injury in question," the trial court erred. See City of Keller, 168 S.W.3d at 810.

In the context of the instant appeal, it is well established that an insurance agent agreeing to obtain insurance owes the legal duty to obtain the insurance and, if he cannot, he must notify his principal of failure. May v. United Servs. Ass'n of Am., 844 S.W.2d 666, 669 (Tex.1992); Frazer v. Tex. Farm Bureau Mut. Ins. Co., 4 S.W.3d 819, 822 (Tex.App.-Houston [1st Dist.] 1999, no pet.). Implicit in a case alleging negligent failure to obtain insurance is the requirement that the loss be one that is covered in some policy. See Hardware Dealers Mut. Ins. Co. v. Berglund, 393 S.W.2d 309, 310–11 (Tex.1965); see also Stinson v. Cravens, Dargan & Co., 579 S.W.2d 298, 300 (Tex.Civ.App.-Dallas 1979, no writ) (affirming instructed verdict where appellant failed to bring loss under coverage of any policy shown by evidence to be available).

Through McGlothlin's testimony, Metro conceded that it agreed to obtain a CGL policy for Lin, accepted payment for said policy, and failed to obtain the policy. McGlothlin also testified that Lin was not notified of the failure to obtain a policy until McGlothlin, himself, discovered the failure. McGlothlin testified that he notified his errors and omissions carrier "[b]ecause I knew that somebody in my office had messed up and I was responsible for it, and I was going to take responsibility for it, and provided there was a covered peril." This testimony constitutes some evidence of the existence of a legal duty and breach of that duty on the part of Metro. See Frazer, 4 S.W.3d at 822.

In addition, the evidence admitted at trial included the Elbert quote, which Lin testified was faxed to Metro and he asked that the Elbert quote "will be my model" and an example of the type of policy he sought. On the Elbert quote, the line providing for "contractual coverage" was checked. According to Lin, this indicated that the Elbert policy would have protected against claims like the surety's claims in the underlying suit. Furthermore, McGlothlin acknowledged that he had received the Elbert quote from Lin and that it seemed to include coverage for contractual liability. This evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions, and it is, thus, more than a scintilla of evidence that Lin's contractual liability would have been covered under some policy. See Stinson, 579 S.W.2d at 300. Finally, it was foreseeable to McGlothlin that his failure to prepare or obtain a policy for Lin would leave Lin uninsured. We conclude that there is more than a scintilla of

evidence to support the jury's affirmative finding to Question 1.

Accordingly, we sustain Lin's third issue.

### D. Submission

In his fourth issue, Lin argues that "there is sufficient evidence to require submission to the jury." Having found more than a scintilla of evidence to support the jury's findings for each of the questions submitted, we sustain issue four.

Despite this evidence supporting the jury's findings in the case, Metro argues that it was entitled to a JNOV because "no evidence was presented that if an attorney had been hired to represent Lin in the surety lawsuit the outcome would have been different." Metro contends that a CGL policy is not a performance bond, and that Lin's proof that he could have gotten a CGL policy is no evidence that a policy to cover the breach of contract could have been obtained in this case. Thus, Metro argues that there was no evidence of causation to support any liability findings in this case. Concerning proof of the outcome, Lin complains that he was entitled to representation *as well as coverage for the claim* under the policy he requested. Further, even if a CGL policy would not *normally* cover contracts, Lin presented evidence of a CGL policy that covered contractual claims, and, thus, he created a fact issue with respect to proximate cause for the negligence claim and producing cause for the DTPA claim that was resolved in Lin's favor. McGlothlin also testified that a CGL policy for breach on contract would be "fairly rare," not that it was unavailable. In other words, the jury chose to believe Lin when he testified that he would have obtained a policy that would have covered the loss he suffered had Metro not acted negligently as found by the jury. The putative insured is not required to "prove a specific policy in order to show that he was adversely affected" by the failure of the insurance agent to obtain the policy. *Parkins v. Tx. Farmers Ins. Co.,* 645 S.W.2d 775, 776 (Tex.1983).

### Factual Sufficiency

In three cross-points, Metro contends that there was factually insufficient evidence to support (1) the jury's response to the liability issues under both the DTPA and negligence theories, (2) the damage findings under Lin's DTPA and negligence theories, and (3) the jury's answer that the unconscionable conduct of McGlothlin/Metro resulted in a damage award of $300,000.

### A. Standard of Review

In reviewing a factual sufficiency point, we consider all the evidence supporting and contradicting the finding. *Plas–Tex, Inc. v. U.S. Steel Corp.,* 772 S.W.2d 442, 445 (Tex.1989); *HTS Servs., Inc. v. Hallwood Realty Partners, L.P.,* 190 S.W.3d 108, 111 (Tex.App.-Houston [1st Dist.] 2005, no pet.). We set aside the verdict only if the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony. *City of Keller,* 168 S.W.3d at 819. They may choose to believe one witness and disbelieve another. *Id.*

### B. Liability

Metro contends that there was insufficient evidence to support a finding that the breach of a contract surety claim would have been covered by a CGL policy. On appeal, Metro argues that it "would submit to the Court that [it is] not aware of any insurance policy, of any type, that would insure a person for his obligations in enter-

ing into a contractual agreement as part of the purchase of a Performance Bond."

McGlothlin testified that he had "never encountered a surety issue on a CGL deal before" and, when asked if it was his understanding that the CGL policy will cover a surety's claim, McGlothlin responded, "never." However, when asked whether he had seen an MGA [5] [managing general agent] who provided contractual liability in a CGL policy, he acknowledged that it "would be fairly rare," without ruling out the possibility. McGlothlin testified that it was rare for a CGL policy to include a contract provision, but he acknowledged that the Elbert CGL policy did appear to cover contract disputes. McGlothlin explained that, "in the surplus lines policy [6] there is no standard. It's not like your standard Texas auto policy. Different companies buy different types risks and policies on surplus lines policies...." The company determines coverage under those policies.

 Metro contends that Lin could have proved coverage by "introducing a standard CGL policy and having a qualified insurance expert give his opinion that a surety claim would have coverage under the policy." We disagree. By presenting evidence of *some* policy that would cover the claim, Lin, at the very least, created a fact question as to coverage. *See Berglund*, 393 S.W.2d at 310–11; *see also Stinson*, 579 S.W.2d at 300. The jury may choose to believe one witness and disbelieve another. *City of Keller*, 168 S.W.3d at 819. Reviewing the evidence in a neutral light, we conclude that the finding was not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176. Accordingly, we overrule Metro's cross-point one.

## C. Damages

### 1. DTPA and Negligence

In cross-point two, Metro asserts that there was factually insufficient evidence presented to the jury to support the damage findings under Lin's DTPA and negligence theories. Specifically, Metro argues that "no evidence was presented that if an attorney had been hired to represent Lin in the surety lawsuit the outcome would have been different." Thus, Metro argues that there was no evidence of causation to support the damage findings. We disagree.

In its briefing, Metro states that this is the same argument that it makes with respect to causation to support any finding of liability in this case. As noted above this argument oversimplifies Lin's complaint: Lin complains that he was entitled to representation *as well as coverage for the claim* under the policy he requested. As noted above the evidence created a fact issue with respect to causation, and the fact issue was resolved in Lin's favor. We overrule cross-point two.

### 2. Mental Anguish

 In cross-point three, Metro contends that there was factually insufficient evidence to support the jury's answer that the unconscionable conduct of McGlothlin/Metro resulted in a damage award of $300,000.

After unanimously finding that McGlothlin and/or Metro knowingly engaged in an unconscionable act or course of action, the jury was asked:

*QUESTION 6*

What sum of money, if any, in addition to actual damages, should be award-

---

5. McGlothlin explained that an "MGA" was a managing general agent who represents "a number of carriers."

6. A "surplus lines policy" is one where the rates are not determined by the state.

ed to Shihche E. Lin, Individually and d/b/a Aptus and Sung–Ping Lin against Mike McGlothlin and/or Metro Allied Insurance because their conduct was committed knowingly?

Answer in dollars and cents, if any.

Answer: ($300,000.00)

"Damages" was not defined in the charge, and Metro did not object to the wording of the charge. Metro contends that evidence is factually insufficient to support a $300,000 finding of "mental anguish damages." However, the jury's finding was not confined to mental anguish damages. Under a "knowing" violation, the DTPA allows an additional award of three times the economic damages. *See* TEX. BUS. & COM. CODE ANN. § 17.50(b)(1) (Vernon Supp. 2006); [7] *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 304 (Tex.2006) (for DTPA violation, could recover economic damages, mental anguish, and attorney's fees, but not additional damages beyond three times economic damages). The jury awarded $175,000 in economic damages. It could have awarded up to $525,000 for the knowing violation and still fallen within the statutory guidelines. Accordingly, we overrule cross-point three.

### Conclusion

We reverse and remand for the trial court to render judgment consistent with the jury's findings.

---

7. Section 17.50(b)(1) provides that a DTPA plaintiff may recover:

> the amount of economic damages found by the trier of fact. If the trier of fact finds that the conduct of the defendant was committed knowingly, the consumer may also recover damages for mental anguish, as found by the trier of fact, and the trier of fact may award not more than three times

the amount of economic damages; or if the trier of fact finds the conduct was committed intentionally, the consumer may recover damages for mental anguish, as found by the trier of fact, and the trier of fact may award not more than three times the amount of damages for mental anguish and economic damages.

TEX. BUS & COM.CODE ANN. § 17.50(b).